893 F.2d 1335
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Billy D. MEADE, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 89-5425.
 United States Court of Appeals, Sixth Circuit.
 Jan. 23, 1990.
 
 Before WELLFORD and DAVID A. NELSON, Circuit Judges, and RICHARD F. SUHRHEINRICH*, District Judge.
 PER CURIAM:
 
 
 1
 Claimant Billy Meade applied for disability benefits in September of 1983, alleging disability beginning on October 13, 1982. Following a series of administrative denials of benefits, a hearing was held before an Administrative Law Judge (ALJ) in February 1987, and the ALJ concluded that claimant became disabled on September 12, 1986 (claimant's 55th birthday), but not before. On appeal, the district court concluded that the ALJ's findings were supported by substantial evidence.
 
 
 2
 The period of disputed disability, then, in this case is from October 13, 1982 to September 12, 1986. The evidence indicates that claimant was laid off from his last mining job when the mine closed on October 13, 1982. Claimant's application for benefits asserted disability based on a fourth stage black lung condition, a back condition, a heart condition, and ulcers. At the hearing, the ALJ concluded that claimant established that he suffered from "arteriosclerotic heart disease with angina pectoris, degenerative arthritis, and peptic ulcer disease, in addition to mental disorders variously diagnosed as including borderline intelligence, a somatization disorder,[1] and a generalized anxiety disorder."
 
 
 3
 Claimant's previous relevant work has been in coal mines, and there is essentially no dispute that Meade was unable to return to his usual coal mine work during the time period in question. At issue, rather, is the ALJ's conclusion that, prior to claimant's reaching advanced age status under application of the grid, he was capable of doing light work that was available in the economy. Evidence from a number of different doctors was introduced at the hearing.
 
 
 4
 Claimant first sought medical care in September 1983, one year after the alleged onset of disability. Dr. Page diagnosed claimant as suffering from pneumoconiosis category 1/1p, and opined that claimant should not return to work in the coal industry or any other dust-related industry. Claimant's electrocardiogram was within normal limits at that time.
 
 
 5
 One week later, claimant was examined by Dr. Clarke, whose examination of Meade revealed a normal electrocardiogram, but also revealed evidence consistent with severe restrictive pulmonary disease and mild obstructive airways disease. Dr. Clarke's opinion was that claimant was "totally and permanently disabled for all work in a dusty environment, and all manual labor...."
 
 
 6
 Shortly thereafter Dr. Varney also diagnosed category 1 pneumoconiosis, and in December 1983, Dr. Modi examined claimant and found evidence of "possible arotic stenosis ..., irregular heart beat causing dizzy spells due to ventricular arrhythmias, chronic obstructive pulmonary lung disease, possible interstitial pulmonary fibrosis due to exposure to inorganic dust and also aggravated by his continued smoking." The doctor also noted limitation of movement in claimant's right shoulder and arthritis in his cervical spine and lower lumbosacral spine.
 
 
 7
 In December of 1983, claimant also saw Dr. T.L. Wright. After reciting claimant's complaints and medical history, Dr. Wright concluded that claimant was "totally and permanently disabled for any work in or around coal mines or any type of dusty environment." Ten days later, claimant was examined by Dr. Ballard Wright, who diagnosed pneumoconiosis category 1, pulmonary disease, suspected arteriosclerotic heart disease, and well-controlled hypertension.
 
 
 8
 In January 1984, claimant was examined by Dr. Myers, who diagnosed category 2 pneumoconiosis, arteriosclerotic heart disease, and ulcers. The doctor found that claimant's pulmonary condition "limits somewhat normal physical activity," and that his heart condition "likewise prohibits arduous manual labor." He concluded that claimant was "incapable of return to underground coal mining, or any form of manual labor."
 
 
 9
 Later that month, claimant was examined by an orthopedic surgeon, Dr. Rapier. That doctor found some degenerative disc disease, but without sensory, motor or reflex abnormalities. He recommended conservative treatment, and found that claimant "should probably avoid moderate to heavy stresses on his back." Claimant saw another orthopedic surgeon five days later. This physician, Dr. Lowe, noted a "rather normal physical examination," but noted some osteoarthritic change, and some cervical disc degeneration.
 
 
 10
 Claimant received a psychiatric and psychological evaluation in February 1984 at Bluefield Mental Health Clinic. His examiners diagnosed generalized anxiety disorder that was severe and chronic, and borderline range intelligence. They described his prognosis as extremely poor, and found that he was "an extremely poor prospect for any type of employment or any type of Vocational Rehabilitation services.... We cannot see any way this man could function in any type of work, part-time or full-time."
 
 
 11
 Another examination by Dr. Page in January 1985 resulted in findings of pneumoconiosis, heart disease, ulcers, arthritis, and chronic anxiety. Dr. Page's impression was that claimant was "totally disabled in all type [sic] of employment because of his inability to work in coal mining, and his lack of training, and education for other types of work." He reaffirmed this opinion in October of 1985.
 
 
 12
 Claimant was examined by Dr. Burke in June 1985, and that doctor found "[n]o significant restriction in patient's tolerance for standing, walking, stooping, bending, lifting, reaching or sitting...." He found claimant to be "socially well adjusted for his station in life and ... capable of self-care. There appears to be no restriction of daily activities, constriction of interests, inability to relate to other people or deterioration in personal habits." Dr. Burke found that claimant's chest pain "does not sound typically anginal," and found that it was "unlikely that the pain is cardiac in origin."
 
 
 13
 Claimant underwent another psychiatric evaluation in June 1985, and Dr. Eardley concluded, "From a psychiatric viewpoint, this individual is not manifesting any serious psychiatric illness, although there may be an emotional overlay relating to his health problems. The prognosis is not remarkable otherwise."
 
 
 14
 Claimant was examined at about the same time by a psychologist, Dr. Snyder, who concluded:
 
 
 15
 Overall, Mr. Meade functions in the borderline range of intelligence. He shows particular deficits in immediate memory and nonverbal problem-solving abilities. He could be expected to have great difficulty in learning any new skills. In addition, Mr. Meade shows academic skills similar to those of the average nine- or ten-year-old. Overall, the client would most likely be restricted to unskilled labor; he is only marginally capable of managing his own funds.
 
 
 16
 Personality assessment suggests a strong psychological component to the client's pain difficulties. While this does not rule out a genuine physical component to Mr. Meade's physical complaints, it does indicate a preoccupation with somatic functioning and an exaggeration of physical difficulties on an emotional basis. Consequently, any evaluation of the client's physical status should emphasize objective physical and laboratory findings.
 
 
 17
 In February 1986, Dr. J.P. Sutherland of the Sutherland Clinic wrote on a prescription pad that claimant was unable to perform gainful work activity due to acute cervical disc syndrome, although no basis for this conclusion was given. Dr. Frank Sutherland in the same clinic reported that examinations of claimant in March and July led him to the conclusion that claimant was capable of performing only minimal activity due to arthritis, chest pain, and shortness of breath.
 
 
 18
 Finally, Dr. Anderson examined claimant in August 1986, and found claimant's EKG to be normal, diagnosed pneumoconiosis category 1, bilateral pleural thickening, combined obstructive and restrictive ventilatory defect, and symptoms of arteriosclerotic heart disease. We will not discuss further medical opinions rendered after Meade was found to be entitled to benefits.
 
 
 19
 At the hearing, a vocational expert who had examined claimant's record, and who had been present throughout the hearing, testified that claimant was not capable of returning to his former work. The following dialogue ensued:
 
 
 20
 Q: Would you have a professional opinion as to whether the claimant retains the capacity to adapt to low stress work place [sic] for simple repetitive tasks outside of the mines?
 
 
 21
 A: It would really depend your honor, on which exhibit you give credence to. For example, there was one exhibit in here from Bluefield Mental Health Center, it essentially gave him a very poor psychiatric prognosis. Also said that his ability to maintain attention and concentration were poor, if you give credence to that particular exhibit, my answer would be no. Yet several of the other exhibits more or less indicated it was a more mild anxiety condition.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 Q: Alright, then if the administrative law judge were to find that the hypothetical claimant with the same background where [sic] moderately limited in his ability to understand and remember detailed instructions and moderately limited to the ability to maintain attention and concentration for extended periods of time and even marketly [sic] limited to the ability to carry out detailed instructions, would that have an impact on your vocational testimony?
 
 
 25
 A: If those are your findings, then my opinion would be that he would be able to perform a variety of unskilled jobs in a clean atmosphere.
 
 
 26
 The vocational expert went on to list over 40,000 such positions in Kentucky, although he noted that some of claimant's subjective complaints might eliminate some of those positions.
 
 
 27
 1. Finding that claimant was capable of performing light work prior to September 12, 1986
 
 
 28
 Claimant asserts that the ALJ erroneously failed to articulate his reasons for rejecting appellant's testimony as to disability between October 1982 and September 1986, that there was no substantial evidence to support the conclusion that claimant was then capable of performing light work, and that the disability onset date of September 12, 1986 was arbitrarily chosen.
 
 
 29
 The ALJ noted that the claimant "acknowledged his continuing inability [ability] to entirely care for his own needs, to regularly operate an automobile, and to leave his home for such purposes as visiting his mother." Claimant was inconsistent in his testimony, conceded memory problems, and gave varying reports about his physical problems and reports of symptoms and background facts to the doctors who examined him.
 
 
 30
 In Hurst v. Secretary, H.H.S., 753 F.2d 517, 519 (6th Cir.1985), we found that it was "absolutely essential" that the ALJ articulate reasons for crediting or rejecting particular sources of evidence. It is not clear to us whether the ALJ accepted or rejected claimant's testimony taken as a whole. The ALJ noted that, "testimony by the claimant was generally consistent with the medical findings," but there are also suggestions to the contrary.
 
 
 31
 We find claimant's assertions that the September 12, 1986 onset date was entirely arbitrary and that no substantial evidence supports that he was capable of work prior to that date are incorrect. The evidence presented might, indeed, support a finding that the claimant was capable of light work even after September 12, 1986. Claimant attained advanced age under 20 C.F.R. 404.1563(d) and 416.963(d), thereby entitling him to a finding of disability based on the same health problems and vocational characteristics that would lead to a finding of no disability in a person who had not yet reached advanced age. Rules 202.01-202.02, Medical Vocational Guidelines, App. 2, Subpt. P, Pt. 404.
 
 
 32
 The evidence in this case is replete with conflicting medical opinions for both exertional and non-exertional conditions from 1983 onward. As noted, Meade's testimony and his histories given to doctors need to be specifically evaluated by the ALJ, who also observed that "claimant's subjective complaints and purported functional limitations ... are supported by the objective medical and vocational findings as of September 12, 1986." (emphasis added). The ALJ does not tell us whether these complaints and purported limitations are supported by substantial evidence before that date and if or whether he accepts Meade's subjective expressions before September of 1986. The ALJ states, in a later finding, that "the claimant has the residual functional capacity for light work." We cannot reconcile these findings in the face of serious conflict in medical and psychological proof and in view of inconsistencies in Meade's statements about his condition. The vocational expert made it clear that existence of a number of available jobs depended upon the ALJ's findings about Meade's mental condition and intelligence level.
 
 
 33
 We accordingly REMAND to the ALJ for prompt and further findings as indicated. Meade has been determined to be entitled to benefits on and after reaching age fifty-five, and we AFFIRM the ALJ's findings in that regard.
 
 
 
 *
 The Honorable Richard F. Suhrheinrich, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Somatization is defined as "[t]he conversion of anxiety into physical symptoms." Stedman's Medical Dictionary (5th Lawyer's Ed.1982)